The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and oral arguments before the Full Commission. The parties have not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award, with the exception of an additional award of attorney's fees to plaintiff's counsel pursuant to N.C. Gen. Stat. 97-88.
* * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as
STIPULATIONS
1. At the time of the alleged injury by accident, the parties were subject to and bound by the provisions of the Workers' Compensation Act.
2. The employer-employee relationship existed between defendant-employer and plaintiff.
3. P.H. Glatfelter/ECUSTA was self-insured with Alexis as its Adjusting Company.
4. On July 8, 1994 plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer.
5. Plaintiff's last date of work for defendant was August 18, 1994.
In addition, the parties stipulated into evidence a Form 22 dated September 2, 1994. The following additional documents were received into evidence by motion of plaintiff after the hearing:
1. Ergonomic job analysis dated August 21, 1995 with a letter by Maryann Kramer to Mr. Ramer attached.
2. Physician's questionnaire by Dr. Lechner dated November 10, 1995.
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. In October 1988, plaintiff began working for defendant as a reclaim operator. Her job involved running two machines which wound cigarette paper onto bobbins or cores. Once a bobbin was full, she would use a wrench to release it from the machine, then remove the roll of paper, which could weigh as much as fifteen pounds, label the roll and place it on a cart. Her average weekly wage was $529.80.
2. On July 8, 1994, plaintiff's department was working with a new product and the bobbins had not been running properly. Consequently, when she arrived for her shift, she had to reverse-wind some rolls. At some point she reached for the stop button on her machine and sustained an electrical shock such that she could not pull her hand away from the machine for a period of time. Finally, the machine made a loud noise which sounded like a gun firing, the bobbin flew off of it and she was freed from the electrical current. She found herself leaning back against the wall which was six feet away from the machine. Her right hand and arm were in severe pain and there was a blackish place on her arm beginning at her wrist.
3. A supervisor immediately came to plaintiff's assistance and asked Linda Carter, her supervisor, to take her to the hospital. She was crying and upset because she could not open her hand. After being evaluated at the local hospital, she was transferred to Asheville where she could see a hand specialist. Dr. Lechner examined her in the emergency room and concluded that she had compartment syndrome with median neuropraxia caused by abnormal pressure in the forearm. In order to prevent nerve damage, he performed surgery to her arm that night. She was released from the hospital the next day.
4. Ms. Carter went to the hospital to pick up plaintiff and took her home. However, since her car was at work, she later asked Ms. Carter to take her back to the plant. They then discussed how she would get paid if she stayed out of work as the doctor had advised, and, since her salary would give her more income, she elected to stay at work. However, she performed no actual work duties but was given a bed to lie in during her shift. After that weekend, she went to the plant during the first shift hours and stayed in the medical department. During the next couple of weeks, she cried frequently and was in significant pain.
5. On July 13, 1994, Dr. Lechner released the plaintiff to do one-handed work and on July 27, he gave her restricted duties with her right hand. Apparently, she was assigned duties at the plant which included some filing, sweeping and picking up cigarette butts. She continued to get upset easily and by August 17, when Dr. Lechner next saw her, she was so depressed she was having suicidal thoughts. Consequently, he referred her to a psychologist, Dr. Simms, who saw her that day. He diagnosed her condition as an adjustment disorder with depressed mood and immediately began providing therapy. He also sent her to her family doctor for antidepressant medication to be provided. Both he and Dr. Lechner took her out of work at that time.
6. During the next month, the condition of plaintiff's hand significantly worsened such that she not only lost significant motion but the last two fingers began to draw up into a clawed position. Furthermore, defendant denied liability for worker's compensation benefits so she began to experience serious financial hardship which aggravated her depression. She also felt hurt by having been given what she felt were demeaning tasks at the plant as well as by the denial of her claim. Dr. Simms contacted both her employer and the adjusting company to inform them that her condition was a direct result of her injury, but they continued to deny liability.
7. Plaintiff received occupational therapy for her hand from late July until the first of November when therapy was discontinued. Dr. Lechner evaluated her on November 2, 1994, and then ordered nerve studies to rule out the possibility of nerve damage. The results were normal, however. Since her contractures did not fit an anatomic pattern, he was of the impression that she had psychogenic dyskinesia. Her hand condition did not improve by February 1995, when he rated her with a twenty-five percent permanent functional impairment to her hand. He also released her to return to work at that time with a one-pound weight limitation plus the requirement that she do no repetitive work with her right hand. Defendant had no available work within those restrictions.
8. Dr. Simms continued to provide psychological treatment. Her financial situation had become so grim by the fall of 1994, that she went to the Sharing House for assistance. The Sharing House was a Christian ministry that provided her with food, clothing, gas for her house, medication and assistance with phone service. She was very grateful for the help and decided to volunteer her services to the organization to the extent that she could. Even with the severe impairment to her hand, she found that she was able to sort and fold clothes donated to the ministry, so she would go there several hours on most week days. The activity was therapeutic for her and Dr. Simms supported her involvement there.
9. Plaintiff continued to have symptoms of depression. In December of 1994, defendant sent her to the Rehab Center in Charlotte where she saw Dr. Duffy, a psychologist. Dr. Duffy diagnosed her with adjustment disorder with mixed anxiety and depressed moods and post traumatic stress disorder. There were some indications on testing that she had cognitive problems so Dr. Duffy wanted an evaluation by a neuropsychologist. Consequently, the following summer she was sent to Dr. Manning who was a neuropsychologist. He had extensive testing performed which consistently showed mild cognitive impairment which would be seen with a closed head injury or an electrical shock. Both he and Dr. Duffy recommended that she undergo a comprehensive rehabilitation program. However, there was no evidence that such a program was ever provided by defendant.
10. On July 8, 1994, plaintiff sustained a compensable injury by accident when her machine malfunctioned and caused her to sustain an electrical shock. As a result of the accident, she sustained an electrical burn type of injury to her arm which led to the development of compartment syndrome. She also developed depression, anxiety and symptoms of post traumatic stress disorder as a proximate result of the injury as well as some cognitive problems.
11. Although she did not actually perform work duties after her injury, plaintiff was apparently at the plant and receiving her regular wages through August 18, 1994. Thereafter, she was unable to work in any capacity until February 17, 1995, when Dr. Lechner released her to return to work with restrictions. She was still not able to perform her regular work duties from a physical standpoint and defendant did not offer her work which was suitable to her capacity. She was not otherwise employed during the time in question. Her activities at the Sharing House were purely as a volunteer and do not show wage earning capacity.
12. Plaintiff had not reached maximum medical improvement as of the date this case was heard by the Deputy Commissioner. She needed to undergo a comprehensive rehabilitation program which would tend to effect a cure, give her relief and lessen her disability. She also required further treatment for her psychological condition.
13. Although plaintiff apparently received some sickness and accident benefits, the evidence did not reveal whether those benefits would have to be repaid upon receipt of worker's compensation benefits for the same period of time.
14. Defendant did not admit that plaintiff sustained a compensable injury until after two hours of testimony had been taken at the hearing even though another employee was there when the accident occurred, a supervisor immediately came to her assistance, she had a visible injury to her arm and the company provided her transportation to and from the hospital. Although it had no support for its position, defendant also maintained that plaintiff's psychological difficulties were not causally related to her injuries. Every psychologist who evaluated her was of the opinion that there was a causal relationship. Defendant sent a private investigator out to conduct surveillance on plaintiff during the time in question. Her video taped activities consistently showed her protecting her right hand and primarily using her left hand. The last two fingers of her right hand remained in a curled position as noted by Dr. Lechner during his examination. There was nothing observed which would indicate that she could use her right hand in a repetitive manner or for lifting of at least ten pounds. Defendant had no work available for her which involved lifting less than ten pounds.
15. This case was defended without reasonable grounds.
* * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. On July 8, 1994, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff is entitled to compensation at the rate of $353.20 per week for the temporary total disability she sustained as a result of this injury by accident beginning August 19, 1994 and continuing thereafter for as long as she remains so disabled. N.C. Gen. Stat. § 97-29.
3. Plaintiff is entitled to have defendant provide all medical compensation arising from this injury by accident including the comprehensive rehabilitation program recommended by Dr. Duffy and Dr. Manning. N.C. Gen. Stat. § 97-2(19); N.C. Gen. Stat. § 97-25.
4. Plaintiff is entitled to an award of attorney's fees in the amount of $9,000 because defendant-employer's actions were based upon stubborn, unfounded litigiousness. N.C. Gen. Stat.97-88.1; Sparks v. Mountain Breeze Restaurant, 55 N.C. App. 663,286 S.E.2d 575 (1982).
5. Plaintiff is also entitled to an attorney's fee assessed against defendant in the amount of $2,000 pursuant to N.C. Gen. Stat. 97-88.
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Defendant shall pay compensation to plaintiff for temporary total disability at the rate of $353.20 per week beginning August 19, 1994 and continuing thereafter for as long as she remains so disabled. Such amounts as have accrued shall be paid in a lump sum.
2. Defendant shall pay all medical expenses incurred by plaintiff as a result of this injury by accident.
3. Defendant shall pay a reasonable attorney's fee in the amount of $11,000.00 to Mr. Ramer as part of the cost of this action. Mr. Ramer may petition the Commission for an additional fee to be awarded from future compensation to be paid to plaintiff.
4. Defendant shall pay an expert witness fee in the amount of $175.00 to Mr. Dortch.
5. Defendant shall pay the costs.
 S/ ________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/ ________________________ THOMAS J. BOLCH COMMISSIONER
S/ ________________________ BERNADINE S. BALLANCE COMMISSIONER